**FOUR STAR PUBLICATIONS, INC., a New York Corporation, et al., Plaintiffs,**

**v.**

**Norman ERBE, an individual, and Norman Erbe, as Attorney General for the State of Iowa et al., Defendants.**

**KNIGHT PUBLISHING CORP., a California Corporation, Plaintiff,**

**v.**

**Norman ERBE, an individual, and Norman Erbe, as Attorney General for the State of Iowa, et al., Defendants.**

Civ. Nos. 4–1020, 4–1021.

United States District Court
S. D. Iowa,
Central Division.

Feb. 23, 1960.

Raymond Rosenberg and Theodore T. Duffield, Des Moines, Iowa, for plaintiffs Four Star Publications, Inc. and others.

Verne Lawyer, Des Moines, Iowa, for plaintiff Knight Pub. Corp.

Norman A. Erbe, Atty. Gen., Frank Craig and Frank Bianco, Asst. Attys. Gen., for defendants.

VAN PELT, District Judge.

The above two cases have been consolidated for trial, and can likewise be combined for the purpose of the Court's discussion of and decision upon the issues.

The actions were brought by a group of foreign corporations engaged in the business of publishing magazines, against Norman Erbe, the duly elected Attorney General of Iowa, whose office

is in Des Moines, within the Southern District of Iowa, and seven other Iowa citizens, not all of whom reside in this District, who were appointed by Mr. Erbe as members of an Advisory Committee, the purpose of which it is claimed by plaintiffs is to assist Mr. Erbe in continuing his campaign against magazines which the Attorney General alleges "are objectionable publications." The prayer of the complaint after asking for a preliminary injunction and other relief *pendente lite,* and which in view of the Court's rulings, as hereinafter mentioned, is now immaterial, then asks "and upon final hearing on the merits herein this Court enter a decree permanently enjoining and restraining the defendants from again prejudging, precensoring and blacklisting and publicly declaring said publications to be obscene or indecent, and in violation of Section 725 [725.5] of the 1958 Code of Iowa [I.C.A.], and from again instructing the County Attorneys that said publications are obscene and indecent and in violation of Section 725 [725.5] of the 1958 Code of Iowa [I.C.A.], and that plaintiffs have such other and further relief as this Court may deem to be just, equitable and proper, including judgment for costs."

Briefly stated, it is the contention of plaintiffs that Mr. Erbe and his Committee have prejudged the publications of plaintiffs through the action taken by Mr. Erbe in addressing a letter to the County Attorneys of each county in Iowa, a copy of which is attached to the complaint as Exhibit A, and is in evidence herein as Exhibit A, and in the making by Mr. Erbe of an address on September 1, 1959 to the Iowa Wholesale Magazine Distributors of Des Moines, attached to the complaint and marked Exhibit B, and in evidence as Exhibit B, and in the action of the Advisory Committee of adopting on September 28, 1959 a resolution in evidence as Exhibit 1. It is claimed that plaintiffs' magazines were all on the newsstands on September 1, 1959 and as a result of the defendants' action the wholesale and retail distributors have refused to purchase from plain-

tiffs the magazines published by them, the names of which will not be set forth but which range from *"Ace"* to *"Zest."* They claim monetary damage and allege that they have no action at law.

Allegations made by the Attorney General that the magazines of plaintiffs on the newsstands on September 1, 1959 were obscene under Section 725.5 of the Iowa Criminal Code, were on motion stricken. The trial by order of the Court was limited to a trial of the issues relating to whether contrary to the First and Fourteenth Amendments to the Constitution of the United States the defendants have in fact prejudged plaintiffs' magazines and their right, if any, to so do.

It has been proven that two of the magazines are printed within the State of Iowa but this fact the Court deems immaterial to a decision herein.

It has been noted that the actions of the Attorney General took place on September 1st and that the Committee's action took place September 28, 1959. The complaints in these cases were filed October 29, 1959. A preliminary hearing was held in each case November 13, 1959 at which time the preliminary injunction was denied, the Court saying that an early trial would be held. The answer of the defendants was filed November 20, 1959. A pretrial conference was held December 16, 1959 at which the cases were set for trial for January 18, 1960. Due to the taking of depositions the trial was continued for one week.

The Court announced at the time of the preliminary hearing that if obscenity was an issue the Court would under Rule 39(c) F.R.Civ.P., 28 U.S.C.A. call an advisory jury. In view of the action of the Court above mentioned limiting the issues, a jury was unnecessary and the trial was had to the Court. The Court remains of the opinion previously expressed that a Nebraska judge should not determine the common conscience of either the Southern District of Iowa or the entire State of Iowa, and comments that this common conscience may very well be different in the rural areas than in

the urban areas, in the river towns than in Des Moines, and in educational centers than in more highly industrialized cities. Judge Brennan very well said in his dissent in the case of Kingsley Books, Inc. v. Brown, 354 U.S. 436, 448, 77 S.Ct. 1325, 1331, 1 L.Ed.2d 1469, as follows:

"The jury represents a cross-section of the community and has a special aptitude for reflecting the view of the average person. Jury trial of obscenity therefore provides a peculiarly competent application of the standard for judging obscenity which, by its definition, calls for an appraisal of material according to the average person's application of contemporary community standards. A statute which does not afford the defendant, of right, a jury determination of obscenity falls short, in my view, of giving proper effect to the standard fashioned as the necessary safeguard demanded by the freedoms of speech and press for material which is not obscene. Of course, as with jury questions generally, the trial judge must initially determine that there is a jury question, i. e., that reasonable men may differ whether the material is obscene."

Judge Harlan in the case of Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, calls attention to action taken in New York on a certain book as being contrary to the action in California on the same book and to the fact that courts in Massachusetts have held obscene that which was held not to be obscene in New York and Pennsylvania (See Note 7, 354 U.S. 476, 506, 77 S.Ct. 1304, 1320). This Court believes, and its decision in part is guided by the belief, that eventually in the different localities of Iowa, juries should determine in criminal cases, whether or not any of plaintiffs' magazines are or are not obscene. This is assuming that plaintiffs continue to publish magazines of the nature of those on the stands September 1 and that the law enforcement officers upon review thereof bring prosecutions.

Criticism is made of the Attorney General in the claim that he has set himself up as a censor. Before I discuss the applicable law I shall pass upon this criticism although in view of my final decision it is not a controlling issue. The Attorney General holds an elective office and is entrusted with over-all supervision of law enforcement in Iowa. No less a figure than J. Edgar Hoover, Director of the Federal Bureau of Investigation, has said on January 1, 1960 in a letter addressed to all law enforcement officials:

"The morals of America are besieged today by an unprincipled force which will spare no home or community in its quest for illicit profits.

"I am speaking of the unquestionable base individuals who spread obscene literature across our land through the means of films, decks of playing cards, photographs, 'comic' books, salacious magazines, paperbacked books and other pornographic products. These forms of obscenity indeed threaten the morality of our Nation and its richest treasure—our young people.

*    *  .  *    *    *    *

"It is also a grievous fact that drugstores and 'sweetshops', pleasant meeting places for past generations, now display publications which a few years ago would have a place in only the bawdiest of gathering places. These signs of moral decay, tolerated by adults, cannot help but debase the thinking of our impressionable teen-agers. Yet, while they are impressionable, American youths are remarkably wise in recognizing pseudo-piety in adults and the sham of a society which condones declining morality.

"In 1957 there were nearly eight forcible rapes per 100,000 inhabitants in the United States. In 1958 this figure increased ten and one-half percent, a forcible rape occurring every 36 minutes! This truly shocking and shameful state of affairs is made even more deplorable

by the knowledge that sex crimes and obscene and vulgar literature often go hand in hand."

This Court will therefore not place itself in the position of being critical of an elected public official be he a county attorney or the attorney general, who endeavors by reason of the office he holds to protect the youth of the community from persons whom Mr. Hoover calls "dealers in depravity." At the same time the Court hastens to state that it has not determined that any of the plaintiffs or their publications fall in this category. That issue, by reason of the Court's sustaining of plaintiffs' motion to strike from defendants' answer, is not decided.

The law applicable here seems clear. The briefs of the parties seem to so recognize.

■ Freedom of speech and of the press is guaranteed under the Bill of Rights. The First Amendment to the Constitution insofar as material here, reads: "Congress shall make no law * * * abridging the freedom of speech, or of the press; * * *." In Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098, the court said:

"In a series of decisions beginning with Gitlow v. People of State of New York, 1925, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138, this Court held that the liberty of speech and of the press which the First Amendment guarantees against abridgement by the federal government is within the liberty safeguarded by the Due Process Clause of the Fourteenth Amendment from invasion by state action." 343 U.S. at page 500, 72 S.Ct. at page 780.

Yet these rights of freedom from restraint, license or censorship are not absolute but relative. See National Labor Relations Board v. Pick Mfg. Co., 7 Cir., 135 F.2d 329. Publishers are subject to the general law as is any other industry conducted for profit. Again quoting from Joseph Burstyn, Inc. v. Wilson, supra:

"To hold that liberty of expression by means of motion pictures is guaranteed by the First and Fourteenth Amendments, however, is not the end of our problem. It does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places. * * *

"* * * This Court recognized many years ago that such a previous restraint is a form of infringement upon freedom of expression to be especially condemned. Near v. State of Minnesota ex rel. Olson, 1931, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357. The Court there recounted the history which indicates that a major purpose of the First Amendment guaranty of a free press was to prevent prior restraints upon publication, although it was carefully pointed out that the liberty of the press is not limited to that protection. It was further stated that 'the protection even as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases.' Id., 283 U.S. at 716, 51 S.Ct. at page 631." 343 U.S. at pages 502–504, 72 S.Ct. at page 781.

In Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1328, 1 L.Ed.2d 1469, the court referred to the above quotation and then said: "To be sure, the limitation is the exception; it is to be closely confined so as to preclude what may fairly be deemed licensing or censorship."

In Roth v. United States, 354 U.S. 476, 483, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498, after relating the history of profanity and obscenity statutes, the court said:

"In light of this history, it is apparent that the unconditional phrasing of the First Amendment was not intended to protect every utterance. This phrasing did not prevent this Court from concluding that libelous

utterances are not within the area of constitutionally protected speech. Beauharnais v. People of State of Illinois, 343 U.S. 250, 266, 72 S.Ct. 725, 735, 96 L.Ed. 919. At the time of the adoption of the First Amendment, obscenity law was not as fully developed as libel law, but there is sufficiently contemporaneous evidence to show that obscenity, too, was outside the protection intended for speech and press."

The court went on to say:

" * * * But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance. This rejection for that reason is mirrored in the universal judgment that obscenity should be restrained, reflected in the international agreement of over 50 nations, in the obscenity laws of all of the 48 states, and in the 20 obscenity laws enacted by the Congress from 1842 to 1956. This is the same judgment expressed by this Court in Chaplinsky v. State of New Hampshire, 315 U.S. 568, 571–572, 62 S. Ct. 766, 769, 86 L.Ed. 1031:

" ' * * * There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. *These include the lewd and obscene * * *. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality * * *.'* (Emphasis added.)

"We hold that obscenity is not within the area of constitutionally protected speech or press." 354 U.S. at pages 484, 485, 77 S.Ct. at page 1309.

Later, in the same case, it is said:

" * * * That argument falls in light of our holding that obscenity is not expression protected by the First Amendment." 354 U.S. at page 492, 77 S.Ct. at page 1313.

From the foregoing it seems certain that neither the defendants nor any one else can prejudge publications such as those of plaintiffs. By the same authority, it is certain that plaintiffs cannot justify the publication of magazines that are obscene or indecent under guise of freedom of speech or freedom of the press. We therefore turn to the question of whether the defendants and particularly the defendant Erbe, have prejudged the magazines.

The basic facts of these cases can be easily stated. After Mr. Frank Craig came to the Attorney General's office in August of 1959, certain purchases were made of magazines which it was thought should be examined for obscenity. Included were magazines of the plaintiff companies. The Attorney General examined or caused these magazines to be examined, and believed they were obscene, within the meaning of Section 725.5 of the Iowa Criminal Code. On September 1, 1959 at a meeting in Des Moines, he made a speech to the Iowa wholesalers and distributors of such magazines (See Exhibit B) and sent a letter to the county attorneys of Iowa (See Exhibit A). Later he asked the seven named defendants to become members of an advisory group and after their meeting on September 28th and their examination of the magazines which were assigned exhibit numbers at the pretrial conference, passed the resolution in evidence as Exhibit 1.

Exhibit 1 is the resolution adopted by the Committee. It commends the Attorney General for "his actions to date". It urges him to allow "the courts to determine the issue" and urges citizens to cooperate with their county attorneys to the end that obscene and pornographic material will no longer be available to the youth of the state.

This Court is of opinion that neither the Committee nor the seven defendant members by this action have prejudged plaintiffs' publications.

In deciding the litigated issue as to defendant Erbe it must be kept in mind that Iowa has a statute reading:

"725.5 Obscene literature—articles for immoral use. Whoever sells, or offers for sale, or gives away, or has in his possession with intent to sell, loan, or give away any obscene, lewd, indecent, lascivious, or filthy book, pamphlet, paper, drawing, lithograph, engraving, picture, photograph, writing, card, postal card, model, cast, or any instrument or article of indecent or immoral use, or any medicine, article, or thing designed or intended for procuring abortion or preventing conception, or advertises the same for sale, or writes or prints any letter, circular, handbill, card, book, pamphlet, advertisement, or notice of any kind, giving information, directly or indirectly, when, where, how, or by what means any of the articles or things hereinbefore mentioned can be purchased, or otherwise obtained or made, shall be guilty of a misdemeanor and be fined not more than one thousand nor less than fifty dollars, or be imprisoned in the county jail not more than one year, or both." (1958 Code of Iowa, I.C.A.)

If the Attorney General thought plaintiffs' magazines on the newsstands September 1, 1959 were in violation of this statute, he had a right to say so. He had a right to ask the county attorneys to prosecute the plaintiffs. Such is the orderly process of prosecution in a state such as Iowa. This does not dispose of our case, however. The question remains what of the magazines yet unpublished on September 1, 1959.

It is clear an Attorney General has no right to prejudge them. The question is, did he? He says, among other things, in his speech:

"I will distribute to you the names of magazines and publications which, I am sure you will agree, violate the statute. With your aid and the help of local law enforcement officials and citizens committees, I an-

ticipate that this list will be supplemented within the near future and I shall write you and the county attorneys advising you of additions to the list. In addition, I will distribute to you the names and particularly the addresses of publishers whose publications are subject to severe scrutiny by my office before they may appear on the newsstands of Iowa."

The letter to the county attorneys, after listing the magazines, says:

"Under the provisions of Section 13.2(7) [I.C.A.] I request that your office take prompt and vigorous action in requiring your magazine dealers to remove these objectionable publications from thier racks *at once* and to bring criminal proceedings for any subsequent violations."

What did he intend by this? Plaintiffs say that he intended to and did prejudge their magazines. Defendant Erbe on the witness stand says that it was not his intention to prejudge and that he only intended to tell the plaintiffs if they published thereafter obscene magazines that they would be prosecuted under the Iowa law. His choice of language was not the best. However, this Court has concluded that it should not read into it something that Mr. Erbe says was not intended.

His testimony is supported by a bit of evidence developed at the trial which the Court deems particularly important. It appears that the magazine "Rogue" published by the Greenleaf Publishing Company, an Illinois corporation, one of the plaintiffs in Case No. 4–1020, is still distributed by the wholesale distributors and is on the newsstands in Iowa (See the testimony of plaintiffs' witness Wallace Schilling). Prior to September 1 approximately 170 accounts were handling this magazine in Iowa. Approximately that number are still handling it. Three have refused and there is an inference in the evidence that there may be some new accounts for this publication. The fact that "Rogue" is still on the newsstands is some evidence that Mr.

Erbe did not prejudge its issues. It refutes plaintiffs' claims that by his action, the Attorney General has effectively kept their magazines off the newsstands.

The fact that future issues of other publications have not returned to the newsstands is not compelling to a conclusion that the defendants have prejudged these future issues. Rather, it is more compelling to the conclusion that these publications have not changed their format. Be that as it may, nothing prevents the current issues of these magazines from returning to the stands other than the risk that they might be in violation of the Iowa obscenity statute. But this is a risk incurred by the plaintiffs when they publish each current issue. It is true that this risk may be greater than prior to September 1, 1959 as a result of the acts of the defendant Erbe, but this increase in risk is not derived from any prejudgment of the current issues by the defendant. Rather, this increase in risk is a result of the initiation of enforcement of a previously inactive statute. These current issues have not been branded, either as obscene or as possibly in violation of the obscenity law. The Court, therefore, must distinguish, and has done so, between threats of prosecution willy-nilly and the awakening of a dormant law by public officials.

The Court therefore accepts the testimony of this elected public official of this great State as to his intent as true. It therefore finds that there has been no prejudging of plaintiffs' publications by Mr. Erbe and that the two actions should each be dismissed at the costs of plaintiffs.

This, as the Court believes, is just. Thus, the matter will not be decided by a United States Court and particularly by a judge from a neighboring state but eventually will be decided by juries in the various communities of Iowa. The juries can thus determine and apply the community standards. Thus, the enforcement of the criminal laws remains where it belongs, in the hands of the people of the State of Iowa.

At the same time this Court has not restrained a duly elected official of this State from doing his duty. Federal Courts should be hesitant in preventing duly elected state officials from performing their statutory duties so long as they are not being arbitrary and so long as the action does not prevent the citizens affected from having their constitutionally guaranteed trial by jury in the locality where the violation occurs, if it does.

This Court has not decided that Section 725.5 of the Statutes of Iowa, when measured by the decisions of the Supreme Court of the United States, is constitutional or that any magazines of plaintiffs are obscene under this section.

The Court is saying only that plaintiffs have failed to maintain the burden that is upon them in order to procure injunctive relief in this court against a duly elected state official. This Court repeats again that standards may be different in the river towns than in the towns of the interior, different in the educational centers than in the highly industrialized areas, different in the rural areas than in the urban communities. The restraining influence of an injunctive decree, state wide in its effect, if one is entered, would do greater injustice than the injury which plaintiffs claim they have suffered. Further, there is every reason to believe that if Greenleaf can distribute "Rogue", any other plaintiff can distribute its magazine at no greater risk than Greenleaf has encountered, through the same retail agencies.

Counsel for the defendant Attorney General will prepare orders in each case in accordance with this Memorandum, submitting the same to counsel for plaintiffs for approval as to form only. This Memorandum does not constitute an appealable order. The appealable order will be the order to be prepared as just mentioned, and the time for appeal will run from its entry.